IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION


DILLINA W. STICKLEY,

       Plaintiff,

v.                                     Civil Case No. 5:22-cv-00022

RELIANCE STANDARD LIFE INSURANCE COMPANY,

       Defendant.


## COMPLAINT

### BACKGROUND

Prior to December 14, 2019, Dillina W. Stickley ("Ms. Stickley") was a full-time partner at the law firm of Hoover Penrod PLC, where she had worked as an attorney for nearly 25 years. Her accomplished practice involved three main areas: general litigation, collaborative law, and employment law. She was successful trying cases before juries and earned a reputation as an outstanding, civil trial attorney. Later in her practice she became a pioneer in the area of collaborative law, having played an enormous role in growing that area of law in her community and throughout the state. Her practice was marked with high degrees of concentration, critical thinking, and stamina. Her clients and colleagues agreed she was tough, a fierce advocate, and full of compassion for the causes and clients she served.

On Saturday, December 14, 2019 as she was preparing Christmas gifts for her family, she slipped backwards on the hardwood stairs in her home and slammed down a flight of nine stairs. She forcefully banged the back of her head and neck upon impact, and continued

1

to knock her head on each step as she slid down the stairway. She was unable to remember the half-hour period directly after the fall.  The first impressions she could describe were excruciating neck and head pain—as if her brain had been forced out of her nose—and extreme nausea. She attempted to power through her injuries and continue with her week, but as the days went by, she began noticing serious cognitive symptoms: double vision, word aphasia, headaches, tinnitus, and difficulty maintaining her balance.

To her horror, Ms. Stickley, who had often succeeded in life through sheer toughness and perseverance, increasingly found herself unable to sustain normal brain activity such as reading, computer work, focus, and concentration for more than a half-hour at a time. She initially assumed that she had suffered a simple concussion that would heal within weeks, but as months passed and she continued to struggle, it became evident that her injuries were more serious than initially feared. Her situation was exacerbated in part because the care accessible to her in a rural community during a global pandemic limited her ability to elevate her care, and because brain injuries by their nature are dynamic:  observation, extensive testing, and above all—time—are required to determine the extent of damage and appropriate treatment. It has now been determined that Ms. Stickley suffered a concussion and brain trauma, and she continues to suffer from Post-Concussive Syndrome, accompanied with occipital neuralgia, posterior vitreous detachment in both eyes, and visual deprivation nystagmus—all consistent with traumatic brain injury. These conditions, implicating a range of cognitive and physical impairments, left her totally disabled from work, from the time of her injury on December 14, 2019.

On April 3, 2020, Ms. Stickley applied for Long Term Disability benefits from Reliance Standard Life Insurance Company ("Reliance"), through a policy that Hoover Penrod PLC maintained for its employees.  Reliance denied Ms. Stickley's claim despite records from her treating physicians, all of whom advised her not to return to work and to go on complete brain rest (i.e., to limit stress, avoid reading, computers, screens, heavy thinking or concentration and to get plenty of sleep). Ms. Stickley appealed Reliance's denial, gathering significant, supplemental medical documentation to demonstrate her impairments.  However, Reliance ignored the subsequent documentation, and instead relied on the report of a single, non-treating psychologist, from a distant state, to reject her claim. This non-treating psychologist, who was hired by Reliance only after Ms. Stickley had presented her claim information, never spoke to or treated Ms. Stickley and never spoke to the specialists most familiar with her conditions and deficits. Ms. Stickley has since exhausted efforts to reverse  Reliance's decision.

Throughout the past two years since her injury, Ms. Stickley, through sheer force-of-will, grit, and determination for which she is known by family and colleagues, has substantially improved her medical condition.  As of the filing of this Complaint, she has learned how to accommodate her injury and its continued adverse impact upon her life so that she can perform some limited material tasks of her job and work for limited hours at the profession she loves.  Yet, she continues to be totally disabled under Reliance's eligibility policies for benefits: she is unable to perform all of the material tasks of her job as an attorney for 30 hours per week.

For these reasons, COMES NOW THE PLAINTIFF, Dillina W. Stickley, by counsel, and files this Complaint for damages and other relief against Reliance Standard Life Insurance Company ("Reliance") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA," 29 U.S.C. § 1001, *et seq.*).

## PARTIES

1.      Plaintiff Dillina W. Stickley is a United States citizen and resident of the town of Bridgewater, in Rockingham County, Virginia. She has worked for the law firm of Hoover Penrod PLC, which is located in Harrisonburg, Virginia, in the Western District of Virginia, for 25 years.

2.      Defendant, Reliance Standard Life Insurance Company ("Reliance") is a properly organized business entity doing business in the Commonwealth of Virginia. The Long-Term Disability Policy at issue in this case was issued by Reliance to Hoover Penrod PLC. Reliance may be served with process pursuant to Fed. R. Civ. Pro. 4(h)(1)(B) as follows:

> C T Corporation System
> 4701 Cox Road, Suite 285
> Glen Allen, VA 23060-6808

## JURISDICTION AND VENUE

3.      This court has jurisdiction to hear this claim pursuant to 28 U.S.C. § 1331, in that the claim arises under the laws of the United States. Specifically, Plaintiff Stickley has exhausted her administrative remedies and her claim is ripe for judicial review to bring this action to enforce her rights under ERISA, as allowed by 29 U.S.C. § 1132(a) *et seq*.

4.      Venue in the Western District of Virginia is appropriate by virtue of Plaintiff Stickley's employment and Defendant's business in this District.

## THE POLICY

5.      At all times relevant to this action, Ms. Stickley has been a covered beneficiary under Reliance Insurance Company Group Long Term Disability Insurance Program, policy number 129-334 Cert. #6154 that Reliance issued to Ms. Stickley's employer, Hoover Penrod PLC, effective as of December 1, 2017 ("the Policy").

6.      Ms. Stickley is covered under the Policy by virtue of her employment as an attorney, specifically, as a partner during her claims period.

7.      The purpose of the Policy is to pay benefits if employees become eligible as a result of Sickness or Injury covered by the Policy.

8.      After the expiration of a 90-day Elimination Period, the Policy is designed to pay claims to a claimant regardless of whether the claimant is under a "Total Disability", a "Partial Disability", or a "Residual Disability".

9.      The terms "Totally Disabled" and "Total Disability" are broadly defined under the Policy, with no requirement for objectively measurable injuries.  A claimant is considered "Totally Disabled" if she cannot perform the material duties of her regular occupation.

10.     "Partially Disabled" and "Partial Disability" mean that the claimant is only capable of performing the material duties of her regular occupation on a part-time basis (less than 30 hours per week), or that she is only capable of performing some of the material duties of her regular occupation on a full-time basis (at least 30 hours per week.))  However, the

distinction between "Total Disability" and "Partial Disability" is not a significant factor in determining whether or not a claimant is disabled because a claimant who is only "Partially Disabled," is considered to be "Totally Disabled," except during the 90-day Elimination Period.

11.     The term "Residual Disability" refers to a claimant that is "Partially Disabled" during the Elimination Period.   Nevertheless, a claimant with a "Residual Disability" is still considered to be under a "Total Disability" for the purposes of the Policy.

12.     Based upon the Policy language outlined in Paragraphs 9 through 11 above, after the expiration of the Elimination Period, the question of whether a claimant suffers from a "Total Disability," a "Partial Disability," or a "Residual Disability" does not have a significant impact on whether the claimant is eligible for benefits. Thus, if a sickness or injury prevents the claimant from performing the material duties of her regular occupation, then the claimant is entitled to benefits, regardless of whether the claimant is "Totally Disabled" or "Partially Disabled."

13.     The distinction between "Total Disability" and "Partial Disability" becomes significant only in determining the amount of benefits to which the claimant is entitled. This is so because the monthly benefits payable under the Policy are offset by income the claimant may earn despite her disability. Therefore, a claimant who is "Partially Disabled" is still entitled to benefits, however, the benefits are typically less than a claimant who is "Totally Disabled" because such benefits are offset by earnings from work performed.

14.     Reliance has conflicting interests with respect to the Policy: it is the insurer who must pay claims to the extent they are valid; and it is also the claims review fiduciary

who determines whether a claim is valid. Despite this conflict of interest, the Policy gives Reliance the sole discretionary authority to interpret the Policy and to determine the grant or denial of benefits to covered employees.

15.    The Policy provides that if Reliance makes an adverse benefits determination against a claimant, the claimant has 180 days following receipt of the determination to appeal the decision.

16.    The Policy contains specific protocols that Reliance must follow when it makes an adverse benefit determination.

17.    Any adverse benefit determination must be in writing and must provide:  (1) the specific reason(s) for the adverse determination; (2) reference to the specific plan/policy provisions on which the determination is based; (3) a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation why such material or information is necessary; (4) a description of the review procedures and time limits applicable thereto; and (5)  copies of any internal rules, guidelines, protocols or other similar criterion relied upon in making the adverse determination.

18.    Under a section titled "ERISA Statement of Rights," the Policy provides that, upon request, the claimant is entitled to copies of documents relating to a claim for benefits without charge.  The Policy further provides that, under ERISA, Reliance must provide copies of such documents within 30 days of request or pay a penalty up to $110 per day until the requested materials are received.

19.    Reliance's review during the appeal is required to take into account all comments, documents, records, and other information that the claimant has submitted

relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

20.     Once an appeal is timely filed, Reliance has 45 days to review the appeal and notify the claimant of its determination.

21.     If Reliance requires more time to complete the determination beyond the initial 45 days, it is entitled to a 45-day extension, but only if prior to the expiration of the initial 45-day period, it notifies the Claimant of the special circumstances requiring the extension and the expected date upon which a determination will be made.

22.     In no event may Reliance exceed the 45-day extension period in making a determination (i.e., its written determination must be made within 90 days from its receipt of the appeal).

23.     Any adverse benefit determination on review is required to contain:  (1) the specific reason(s) for the adverse determination; (2) reference to the specific plan/policy provisions on which the determination is based; (3) a statement that the Claimant is entitled to receive, upon request and free of charge, copies of all documents and other information relevant to the claim; (4) a statement of the Claimants right to file and ERISA action; (5) copies of any internal rules, guidelines, protocols or other similar criterion relied upon in making the adverse determination; and (6) a statement regarding voluntary alternative dispute resolution.

## DILLINA W. STICKLEY AND HER LONG-TERM DISABILITY CLAIM

24.     Plaintiff is 64 years of age.  When she became disabled on December 14, 2019, she was employed full-time as an attorney at Hoover Penrod PLC.

8

25.     Tasks and duties that Ms. Stickley performed as an attorney included meeting with clients, analyzing cases and counseling clients regarding the law. She met with adverse attorneys on an ongoing basis. She prepared documents, spreadsheets, emails, forms, and other materials on a computer and used handwritten notes while working on her clients' cases. She performed legal research using online tools, consulting hard-copy treatises and other materials regarding her clients' cases. She engaged in negotiations on a regular basis with other attorneys and adverse parties. Her negotiations, communications, preparation, and other activities included remote participation over Skype. She prepared for and participated in hearings and trials in state and federal courts which included pre-trial preparation for documents, negotiations, phone calls, emails, mathematical calculations, and document creation. She instructed and supervised legal assistants and paralegals, and mentored associate lawyers. She instructed and consulted with other attorneys at Hoover Penrod PLC. She was required to drive to and from client businesses, legal seminars, and the office. She regularly prepared for and participated in legal seminars as a participant, trainer and presenter, sometimes preparing materials for and presenting to groups from 50 to 200 people. She also handled human relations matters for Hoover Penrod PLC.

26.     The nature of Ms. Stickley's work was highly complex, involving difficult cases beyond "garden-variety" claims both in litigation and trial work as well as in her collaborative practice. She holds specialized certification for different areas of practice, and accordingly she handled complicated matters that required her to be available to her clients at all hours including holidays, weekends, and vacations in order to respond to crises in real time. She was and continued to be sought out by other attorneys at and outside her firm for

consultations to refer to her or to consult on difficult cases and complex litigation.  Ms. Stickley's tasks and duties as an attorney at Hoover Penrod PLC are typical duties of attorneys in the national economy, and not exclusive to Hoover Penrod PLC.

27.    Ms. Stickley also taught business law at Bridgewater College in the evenings.

28.    On December 14, 2019, Ms. Stickley fell backwards down hardwood stairs in her home, with the initial impact to the back of her head and neck. After the initial impact, she continued to hit the back of her head on the stairs as she slid down the stairway. She does not recall losing consciousness, but could not remember anything after she fell for approximately twenty-five minutes. She became immediately nauseous after the fall.

29.    Ms. Stickley attempted to return to work at Hoover Penrod PLC the Monday following her fall, December 16, 2019. Legal staff noticed that Ms. Stickley was not well, had difficulty focusing, lost her train of thought, and made unusual errors in her documents and conversations.

30.    Concerned, Ms. Stickley scheduled the next available appointment with her Primary Care Physician ("PCP"), Dr. Leichty.

31.    During her PCP visit on December 18, 2019, Dr. Leichty noted a hard knot on Ms. Stickley's head, and bruising on her neck and upper/lower back.

32.    Ms. Stickley also reported headaches, difficulty concentrating, and visual problems; including difficulty looking at computer screens and reading out loud, and residual pain in her left elbow.   She also described a "funny sensation" of numbness and tingling on her scalp over her occipital lobe (the occipital lobe is the seat of the brain's visual cortex, that allows individuals to see and process visual information).

33.     Dr. Leichty concluded that Ms. Stickley had suffered a concussion without loss of consciousness, and instructed her to avoid use of the computer, television, and phone screens. He noted that symptoms should improve over the next 2-3 days, but also that if she developed numbness, weakness, tingling, nausea, vomiting or change in headaches to get rechecked.

34.     Ms. Stickley's condition did not improve in 2-3 days. She became so concerned about her symptoms that on December 26, 2019, her husband took her to the Emergency Department at Sentara Rockingham Memorial Hospital ("RMH").

35.     When she was evaluated in the emergency room at RMH, Ms. Stickley described suffering from ongoing headaches, dizziness, and fatigue since she had visited her PCP on December 18, 2019. Ms. Stickley also reported problems while reading at work, including missing things like grammatical errors and big mistakes that she would otherwise never have missed. She also recalled an instance of going outside to pick up dog waste in her yard, and was not able to find any because her vision was so impaired, even though it was all over the yard. Symptoms also surfaced when she tried to read, use her cell phone or watch television.

36.     She denied feeling ill prior to the fall, or fainting.

37.     The emergency room attending physician's notes documented that she presented signs and symptoms most consistent with concussion: headaches, visual disturbance, decreased reaction time, fogginess, and difficulty concentrating.

38.     After further evaluation, the emergency room physician referred Ms. Stickley to the Sentara Orthopedic & Sports Medicine Specialists, where there was a Concussion

Clinic. Ms. Stickley was counseled to avoid strenuous concentration, and anything that would put her at risk for another head injury. After this counseling, she agreed not to return to work because her symptoms were greatly exacerbated by reading or concentrating.

39.     On January 3, 2020, Ms. Stickley had her first appointment at the Concussion Clinic at Sentara, with Dr. Thomas Weber.  As part of the Concussion Clinic's evaluation of her condition, Ms. Stickley completed an Acute Concussion Evaluation ("ACE"), which requires a patient to indicate symptoms they are experiencing that are calculated at the end for an "ACE score." The more symptoms a patient has, the higher their ACE score, a score of 22 being the highest. The symptoms and corresponding scores track Physical, Cognitive, Emotional, and Sleep conditions.

40.     At that Concussion Clinic initial visit,  Ms. Stickley's ACE score was 19 out of 22, and indicated she was suffering from headaches, nausea, balance problems, dizziness, visual problems, fatigue, sensitivity to light, sensitivity to noise, numbness/tingling; feeling mentally foggy, feeling slowed down, difficulty concentrating, difficulty remembering; irritability, sadness, feeling more emotional; drowsiness, sleeping less than usual, trouble falling asleep; and that all of these symptoms worsened with physical activity and cognitive activity. Additionally, the ACE score measured how different an individual felt from their normal selves. On a scale from 0 to 6, 6 being "Very Different," Ms. Stickley rated a 5.

41.     Dr. Weber observed that Ms. Stickley appeared dazed or stunned, and confirmed that Ms. Stickley experienced amnesia just after her fall. Dr. Weber instructed Ms. Stickley to go on total brain rest, to limit her activities, and not to read or do computer work for the remainder of the month. She was instructed that she should limit work to one

to two hours per day for the next three to six weeks and to decrease her activities if symptoms worsened.

42.     Dr. Weber opined that it was a good idea for Ms. Stickley and her husband to travel to Florida over the winter, where they had a second home. It was paramount that Ms. Stickley avoid all risk of additional falls, and there would also be no danger of ice and snow to slip on.

43.     On January 4, 2020, Ms. Stickley and her husband traveled to Florida. Ms. Stickley's husband did all of the driving because she had been advised by doctors not to drive.

44.     Ms. Stickley maintained a concussion journal to contemporaneously document symptoms she was experiencing between January and the end of February in 2020. Consistent with diagnoses from her care providers to this point, she recorded symptoms of headaches; nausea; buzzing, ringing, and hissing in her ears; vision and word problems; exhaustion; inability to write or text; inability to look at screens; halo vision; sensitivity to light and sound; an inability to perform work or life tasks of any complexity for longer than short periods; and other symptoms captured elsewhere in her medical records.

45.     Reliance maintained copies of Ms. Stickley's diaries in its claim file.

46.     During a telehealth check-up three months after her initial visit at the Concussion Clinic, Ms. Stickley's ACE score was a 17 out of 22: showing only 2 points of improvement. Her cognitive and physical symptoms persisted, and continued to be exacerbated with light, noise, cognitive and physical activity, stress, and multitasking.

47.     Dr. Weber advised Ms. Stickley to begin occupational and physical therapy, as well as behavioral therapy with a psychologist, but did not take the additional step of referring her to a neurologist or neuropsychologist. He confirmed that she should not return to work, and that she should remain on brain rest.

48.     On March 12, 2020 Dr. Weber completed a "Physician's Statement" form for Reliance indicating that Ms. Stickley should remain off work until at least June 11, 2020, because her condition required rest and lack of stress (brain rest) until she could be re-evaluated.

49.     The global COVID-19 pandemic took hold in the United States mid-March, and Ms. Stickley was unable to schedule physical therapy, occupational therapy, or behavioral therapy appointments per Dr. Weber's referrals due to country-wide lock downs.

50.     On April 3, 2020, Ms. Stickley submitted her claim for Long Term Disability benefits from Reliance under the Policy.

51.     When Ms. Stickley submitted her claim, she provided copies of her December 18, 2020 PCP visit, her December 26, 2020 Emergency Room visit, her January 3 and March 5, 2020 Concussion Clinic visits, as well as her February 5, 2020 telehealth visit with the Concussion Clinic, and the March 12, 2020 Physician's Statement from Dr. Weber stating that she was not to return to work until she could be re-evaluated. Ms. Stickley also included with her claim a list of the complex tasks and duties she was required to perform as an attorney, and her concussion journals.

52.     On April 8, 2020, Ms. Stickley had a one-hour telephone interview with a Reliance Claims Examiner, Jennifer Rand, where she described her fall, her on-going

symptoms and her struggles to return to work.  Ms. Rand observed and documented moments when Ms. Stickley stuttered, exhibited delayed speech, and had difficulty finding her words throughout the discussion.

53.     While recalling how she felt physically after the fall, Ms. Stickley described to Ms. Rand that she felt as if her brain had come out of her nose, and that she became immediately nauseous.  Ms. Stickley explained to Ms. Rand that she did not seek emergency medical treatment immediately after the fall because she did not notice any blood coming from her head.

54.     Ms. Stickley also described the challenges she faced in her attempt to return to work on the Monday after her fall, including making mistakes that were not typical for her, having difficulty finding her words, and Ms. Stickley's legal staff noticing that she was not well.

55.     After having spoken for an hour, Ms. Rand observed that Ms. Stickley was very exhausted from the conversation. Ms. Rand kept notes during the call, inputting them into a system whereby they became part of Reliance's file for Ms. Stickley.

56.     On April 26, 2020, Ms. Stickley visited an Urgent Care facility in order to expedite the physical and occupational therapy that Dr. Weber had prescribed, re-obtaining referrals for those specialists.

57.     On April 30, 2020, Ms. Stickley attended the first of 19 occupational therapy sessions. During these sessions, she attempted to do simulated work activities and obtain details about her work performance limitations. Her occupational therapist made numerous

observations that Ms. Stickley's performance would decline after 10 minutes of simulated work, depending on the task.

58.     Even after 19 sessions of occupational therapy, Ms. Stickley struggled to work for periods longer than 1 hour.

59.     Mental overstimulation from performing work tasks was the main trigger for Ms. Stickley's symptoms, after which she would be unable to function normally for long periods of time. For instance, after an occupational therapy appointment on May 8, 2020 during which she was performing eye exercises, Ms. Stickley reported being unable to function for several days due to debilitating headaches and nausea caused by the exercises. About a month later, a similar period of debilitation occurred after Ms. Stickley attempted combined work-life tasks for 4.75 hours during an occupational therapy appointment on June 2, 2020. Not only was Ms. Stickley unable to perform work-life tasks for the days following her June 2 appointment, but at her June 5, 2020 appointment, her ability to write diminished severely after 45 minutes, resulting in a 75% error rate.

60.     The occupational therapist's notes toward the end of her 19 sessions show that Ms. Stickley was able to work in short spurts at various times throughout the day; and that by taking breaks or resting, she could average approximately 2 hours of work per day.

61.     Ms. Stickley began physical therapy sessions on April 30, 2020, contemporaneously with her occupational therapy.  She attended her first of 15 sessions on April 30, 2020 and completed physical therapy on June 18, 2020.

62.     Initial objective testing during the April 30, 2020 physical therapy appointment revealed severe impairment in gait with narrow base of support, moderate

16

impairment with horizontal and vertical head turns while walking, moderate impairment with pivoting, moderate impairment with stairs, and mild impairment with stepping over obstacles, changing speed, and walking backwards. Her eye movement was also impaired due to vestibular hypofunction.

63.     Objective testing performed on May 28, 2020 revealed severe impairment when walking with her eyes closed, mild impairment when walking on steps, mild impairment in ability to step over a shoe box without changing gait speed, mild impairment with heel-to-toe walking, and mild impairment with walking backwards.

64.     During the same timeframe in which Ms. Stickley was attending occupational therapy and physical therapy, Reliance was completing its initial review of Ms. Stickley's claim and whether or not to award her benefits.

65.     On May 6, 2020, Kayla Burnham, a Claims Examiner for Reliance, spoke with Ms. Stickley to confirm information that Ms. Stickley had provided up to that point. She recorded the phone conversation using contemporaneous notes, inputting them into a system where they became part of Reliance's file for Ms. Stickley.

66.     In her notes relating to the May 6, 2020 call, Ms. Burnham indicated that she asked Ms. Stickley why she was seeing an orthopedic specialist rather than a neurologist or neuropsychologist.  Ms. Stickley responded that Dr. Weber at the Orthopedic & Sports Medicine (concussion) clinic had not referred her to visit any other specialists, and that she visited Dr. Weber's clinic because it was the only concussion clinic in the area to which she had been specifically referred by the RMH emergency room physician.

67.     In the same call with Ms. Burnham, Ms. Stickley explained that she still had all of the symptoms she had previously noted. Specifically: balance, visual deficits/vision loss, stuttering, trouble finding words, headaches, and ringing in her ears. These symptoms limited what she could tolerate, because too much brain stimulation would cause triggering and exacerbation of her symptoms. Ms. Stickley also noted sensitivity to sound/light, that she could not be on the computer or drive more than 30 minutes before she had to lay down in a dark room and allow her brain to rest and her symptoms to subside.

68.     Ms. Stickley explained to Ms. Burnham why she was in Florida, mentioning her discussions with Dr. Weber and the need to avoid risk of additional falls.

69.     In this call Ms. Stickley informed Ms. Burnham that she was no longer teaching college-level business law due to her injury.

70.     Ms. Stickley also mentioned that she was undergoing occupational and physical therapy. Specifically, Ms. Stickley explained that she was working on her left eye to synchronize with her brain, and that she was working on reflex training and balance therapy.

71.     Ms. Burnham did not request documentation of the occupational or physical therapy that Ms. Stickley discussed, nor did she illicit details of deficits that would require Ms. Stickley to work on synchronizing her eyes with her brain, her reflexes, or her balance.

72.     On May 13, 2020, Reliance notified Ms. Stickley by letter that her claim for Long Term Disability benefits was denied because, after reviewing all of the information provided to Reliance by Dr. Weber, Dr. Leichty, and the Emergency Department at RMH,

there was a lack of medical evidence to support that Ms. Stickley met the Policy's definition of Total Disability.

73.     The only specific plan or Policy provisions that Reliance cited when it denied Ms. Stickley's claim were the definitions of "Total Disability," "Partial Disability" and "Residual Disability."  Because "Partial Disability" and "Residual Disability" are captured in the definition of "Total Disability" under the Policy, the only standard Reliance provided for Ms. Stickley to meet, in order to be eligible for benefits, was that her symptoms from the fall prevented her from performing full-time (at least 30 hours per week) work as an attorney.

74.     In its May 13, 2020 denial letter, Reliance criticized Ms. Stickley's evidence by stating that there was no referral to a neurologist or a neuropsychologist.  However, Reliance failed to provide copies of any internal rules, guidelines, protocols or other similar criterion that required her to seek treatment with a neurologist or neuropsychologist to properly perfect her claim.

75.     While the denial letter noted various exam results as being within normal limits, it failed to weigh or even acknowledge substantial evidence in Ms. Stickley's file supporting her claim, including its own Claims Examiners' observations of stuttering, delayed speech and difficulty with word finding.

76.     There was no acknowledgment or discussion of Ms. Stickley's concussion diagnosis, or her poor scores on the ACE concussion exams.

77.     There was no acknowledgment or discussion that her care providers all noted that she could not perform work or even many life activities for longer than a couple of hours without debilitating symptoms; or that all of her treating doctors had ordered her to recover

with total brain rest.  There was no acknowledgment or discussion that all of her doctors instructed her not to return to work.

78.    The Policy required Reliance to provide Ms. Stickley with a description of any additional material or information necessary for her to perfect her claim and to provide her with an explanation why such material or information is necessary.  Beyond blankly noting that there was no referral to a neurologist or neuropsychologist, Reliance's denial letter failed to describe any additional material or information necessary for Ms. Stickley to perfect her claim and failed to explain why such material or information was necessary.

79.    Reliance's unreasonable decision-making process is brought to light by its internal records, specifically a "CDM Discussion" held on May 12, 2020, where Kayla Burnham, (the Claims Examiner), Dr. John Del Valle, Nicole Joyce, Jennie Keith, and April Seddon discussed Ms. Stickley's claim. Based upon the notes from this meeting, the group minimized, overlooked, or flagrantly mischaracterized the extent of Ms. Stickley's injury.

80.    Despite the record showing that Ms. Stickley did not receive treatment for her fall until days after it happened, Dr. Del Valle of Reliance observed, without evidence, that on the date of loss (December 14, 2019), her symptoms were baseline with all normal testing. He neglected the fact that at her initial visit with her primary care physician on December 18, 2019, her doctor noted several deficits when he treated her, including a hard knot on Ms. Stickley's head, and bruising on her neck and upper/lower back.  Dr. Del Valle also failed to note that Ms. Stickley's treating physicians noted ongoing deficits during several follow up evaluations.

81.     The Reliance group failed to address the specific instructions given to Ms. Stickley by multiple treating physicians that she avoid computer and phone screens, remain on brain rest, and refrain from returning to work until she could be re-evaluated in June 2020.

82.     The Reliance group overlooked Dr. Weber and Ms. Stickley's reasons for her travel to Florida (to reduce her fall risk and to remain on brain rest.)  Instead, Dr. Del Valle accused Ms. Stickley of "questionable" behavior, asking why Ms. Stickley was driving out of state and not elevating her care, despite the record being clear that her husband had done all of the driving.

83.     While Dr. Del Valle stated that neurophysiological testing would be needed, that requirement was never passed on to Ms. Stickley in the denial letter.

84.     Ms. Stickley's occupational therapy or physical therapy referrals were noted, but her disclosure that she was currently receiving such treatment for her deficits was not noted, even though Ms. Burnham had discussed these matters with Ms. Stickley only a few days prior to the CDM Discussion.  Reliance's denial letter failed to request that she provide these records.

85.     Ms. Stickley's thorough concussion journal, which outlined her day-to-day symptoms and the effect they had on her attempts to work, was also not discussed.

86.     Moreover, the group failed to address the fact that its own Claims Examiner, Jennifer Rand, made first-hand observations of Ms. Stickley's delayed speech, word-finding, and mental fatigue during her hour-long call with Ms. Stickley on April 8, 2020.

87.     Ms. Stickley's ACE scores showing severe concussion symptoms with little improvement over time were also never mentioned or reviewed during the CDM Discussion; or if they were, they were blatantly ignored and not recorded.

88.     Inherent in Reliance's denial is the conclusion that Ms. Stickley should have ignored her doctors' advice and continued working full-time after her fall until its denial of her claim. This position is in direct contradiction to the considerable evidence from Ms. Stickley's numerous care providers that not only was she physically incapable of complex brain function without debilitating symptoms, but had she attempted to return to work, she would have hindered her own recovery.

89.     On June 19, 2020, Jacob T. Penrod, counsel for Ms. Stickley (hereinafter "Counsel") notified Reliance that he would be representing her in her Long-Term Disability claim. In the same letter, he requested copies of all documents, records, and/or other information relevant to Ms. Stickley's claim for benefits, including but not limited to a complete copy of the medical records that Reliance had in its file to date. Additionally, he requested copies of any internal rules, guidelines, protocols or other similar criterion Reliance relied upon in denying Ms. Stickley's claim, as well as any internal rules, guidelines, protocols or other similar criterion that would be applicable to Reliance's appeal process.

90.     Reliance failed to respond to Counsel's request for documents within 30 days as required by its Policy.

91.     On August 4, 2020, Counsel sent a follow-up request to Reliance, asking again for the materials he had previously requested on June 19, 2020.

92.     On August 26, 2020, 37 days past the 30-day deadline to provide requested materials to Counsel, Kayla Burnham transmitted Reliance's claim file for Ms. Stickley. However, Reliance's response did not include any internal rules, guidelines, protocols or other similar criterion that Reliance relied upon in denying Ms. Stickley's claim, nor similar materials that would be applicable to Reliance's appeal process.

## APPEAL OF THE CLAIM DENIAL

93.     On November 5, 2020, Counsel submitted Ms. Stickley's appeal to Reliance via overnight delivery service.

94.     The appeal contained extensive additional medical documentation, including the occupational and physical therapy records referenced in paragraphs 57 through 63 above, a functional capacity evaluation, records from Ms. Stickley's treating physicians, including a neurologist, a neuro-ophthalmologist, and a neuropsychologist, all of which supported her disability claim that she was incapable of working full time as an attorney.

95.     Records from May 2020 from Ms. Stickley's neuro-ophthalmologist, Dr. Marc Levy, specifically diagnosed her with occipital neuralgia (where nerves that run through the scalp above the occipital lobe are injured or inflamed) stemming from her fall. This diagnosis is consistent with symptoms that Ms. Stickley presented to Dr. Leichty on December 18, 2019: the "funny sensation" she felt in her scalp above her occipital lobe referenced in paragraph 32.

96.     Dr. Levy also diagnosed posterior vitreous detachment in both eyes, and visual deprivation nystagmus, an involuntary and rhythmic movement of the eye that causes visual deficits. He likewise attributed these conditions to her fall. To treat pain and

inflammation from these conditions, Ms. Stickley received occipital nerve blocks and steroid injections into her head over the course of nine months.

97.     Records from June 2020 from Ms. Stickley's neurologist, Dr. Davender Khera, concluded that Ms. Stickley suffered a concussion from her fall and that she was currently suffering from post-concussive syndrome. Dr. Khera diagnosed Ms. Stickley with mild cognitive impairment.

98.     In July of 2020, after witnessing her continued deficits even after treatment, Dr. Khera concluded that Ms. Stickley should have stopped working immediately after her fall. He noted that given her persistent symptoms, he thought it unlikely that Ms. Stickley would be able to return to work as an attorney full time. He commented that with continued therapy, and with time, it would be possible for her to return to work some days at full capacity, but he did not have a concrete prognosis due to the severity of her symptoms.

99.     On September 14, 2020, Ms. Stickley underwent neuropsychological testing with Dr. Scott Bender, a neuropsychologist. The objective testing lasted for four hours, during which time Ms. Stickley required a break due to fatigue and headache. The test results indicated that Ms. Stickley was improving, but still suffered from significant visual impairments 10 months after her injury.  Specifically, the testing revealed that Ms. Stickley's visual scanning and selective attention were borderline impaired for her age, that her visual detection accuracy was low-average, her visual concept identification and serial reasoning abilities were below expectations, and that she made an unusually high number of non-perseverative errors. Her complex visuomotor sequencing and cognitive flexibility were found to be moderately impaired.

100.    Dr. Bender was concerned that Ms. Stickley suffered injury to her visual system and he recommended that she follow-up with her neuro-ophthalmologist, Dr. Levy. He, like Dr. Levy, concluded that her symptoms were directly related to the fall, and that while she may have some capability of working, she would not be able to do so at the level of productivity she was accustomed to prior to the fall.

101.    Based upon his testing, Dr. Bender additionally concluded that Ms. Stickley's injury was more severe than a concussion, that she very likely experienced a brain injury of at least mild severity and that it is possible that her injury was actually more severe than that.

102.    Dr. Bender's report paints a picture of a strong-minded woman, who is fiercely reluctant to admit the effects of her injury for fear of being perceived as weak or lazy, rather than a person who would exaggerate her injuries to gain advantage.

103.    On October 15, 2020 Ms. Stickley followed up with Dr. Levy, her neuro-ophthalmologist, who administered additional occipital nerve blocks to treat her persistent symptoms.

104.    Several weeks later she filed her appeal.  The neuropsychologist, neurologist, and neuro-ophthalmologist records provided to Reliance supported findings of Ms. Stickley's deficits causing an inability for her to return to full-time work. Even where they showed her making improvements, they were clear that Ms. Stickley could not perform work or life tasks that aggravated her symptoms for longer than a few hours at a time.

105.    While these were precisely the kind of records the CDM Discussion group privately suggested would have aided in the initial review of Ms. Stickley's claim, and Ms. Stickley repeatedly requested that Reliance provide her with guidance on the types of

information she would need to perfect her claim, Reliance repeatedly ignored her requests to provide such information.

106.    Upon filing her appeal, Ms. Stickley again attempted to get Reliance to reveal the requirements and criterion it would rely on to evaluate the merit of her claim.  Her appeal letter reminded Reliance that she had previously made multiple requests for copies of all internal rules, guidelines, protocols or other similar criterion relating to her claim, but that no such documents had been received to date, and that she was again requesting that Reliance provide such information to her.

107.    December 21, 2020 marked the time when Reliance was obligated to respond to Ms. Stickley's appeal, but it failed to issue a determination by that date.  Reliance continued to ignore Counsel's request for internal rules, guidelines, protocols or other similar criterion relevant to her claim and appeal.

108.    On January 13, 2021, Counsel contacted Reliance to inquire as to why it had failed to respond to Ms. Stickley's appeal within the 45-day period set forth in the Policy. Despite FedEx receipt records confirming Reliance's receipt and acceptance of the appeal package of Ms. Stickley's on November 6, 2020, Kayla Burnham informed Counsel that Reliance had not received the appeal.  Ms. Burnham requested Counsel to re-send the appeal information for an "expedited" review.

109.    Ms. Burnham requested the tracking receipt and other information from the November 6, 2020 delivery.   That same day, January 13, 2021, Counsel forwarded the FedEx receipt confirming Reliance's receipt of the appeal package on November 6, 2020.

Counsel also re-sent electronic copies of the hard-copy appeal materials it had previously sent to Reliance on November 5, 2020.

110.   Ms. Burnham promised to investigate the matter and inform Counsel what had happened to the appeal package.  She never did.

111.   On January 21, 2021, 76 days after Counsel submitted the appeal, Ms. Burnham informed Counsel by voicemail, not in writing, that Reliance had completed an expedited review of Ms. Stickley's claim denial, determined that it would confirm the denial, and that the matter had been forwarded to an appeal review unit.

112.   Reliance never explained why it took 76 days to review the appeal and why it failed to respond to the appeal within the 45-day deadline required by its Policy.

113.   Moreover, prior to January 21, 2021, Ms. Stickley had not been notified of any review or appeal process other than the specific appeal process referenced in the Policy, outlined in paragraphs 15 through 23 above (i.e., upon the initial denial of the claim, the claimant must file an appeal within 180 days and Reliance must respond in writing within 45 days, unless it notifies the claimant of its need of a 45-day extension prior to the expiration of the initial 45-day period).

114.   On January 22, 2021, Counsel wrote to Reliance requesting that it comply with its Policy, specifically that it provide: (1) the specific reasons for the adverse determination; (2) the specific plan or policy provisions on which the determination was based; (3) a description of any additional material or information necessary for Ms. Stickley to perfect her claim, and why such material was necessary; (4) clarification of the procedural

status of Ms. Stickley's claim and written clarification of Reliance's review and appeal process, including any and all time limits applicable to such process.

115.    Counsel again refreshed Ms. Stickley's previous requests for internal rules, guidelines, protocols or other similar criterion that Reliance relied upon in its review and denial process; and requested confirmation in writing if no such protocols existed.

116.    Counsel also requested copies of Reliance's claim report covering the period from August 25, 2020 to the present (January 2021), as well as any expert reports, medical reports or other documents generated by Reliance in relation to Ms. Stickley's claim since August 25, 2020.

117.    On January 29, 2021, Jamil Jackson, a Claims Auditor at Reliance's appeals department, wrote to Counsel to confirm that Reliance was performing an additional review of Ms. Stickley's claim.  No explanation was provided as to where Ms. Stickley's claim was situated within the appeals process set forth in the Policy.

118.    Moreover, Reliance failed to give the specific reasons for its January 21, 2021 denial of benefits, failed to provide the specific plan or policy provisions on which the determination was based, failed to address Counsel's request for clarification of the appeals process, failed to provide any response to Counsel's request for Reliance's internal rules, failed to respond to Counsel's request to confirm or deny the existence of such internal rules, and failed to provide any documents pursuant to Counsel's request for updated file materials. Instead, Mr. Jackson requested a new, signed medical information authorization.

119.    Seven days later, on February 4, 2021 Mr. Jackson contacted Counsel by telephone to inform him that Reliance was reviewing Ms. Stickley's appeal, but that its

copies of her appeal records were not scanned correctly by Reliance.  That same day, and for the third time, Counsel sent Reliance the same appeal documents he had previously sent to Reliance on November 5, 2020 and again to Ms. Burnham on January 13, 2021.

120.    Coincidently, February 4, 2021 was the 90-day deadline under which Reliance was required to review the appeal it received on November 6, 2020.  In addition to violating its promise by failing to provide Ms. Stickley with any explanation as to why it failed to process her appeal upon receipt, Reliance also violated its Policy by failing to notify her of any need for an extension of the standard 45-day appeal period and failed to provide any special circumstances requiring an extension.

121.    By February 22, 2021, Reliance still and yet again failed to respond to Counsel's January 22, 2021 request for documents, despite the Reliance Policy provision requiring Reliance to provide documents relating to the claim within 30 days of request.

122.    On March 12, 2021, Counsel expressly reminded Reliance that Ms. Stickley did not waive the time limits set forth in the Policy and reminded Reliance that it had in fact received the appeal four months earlier on November 6, 2020.

123.    On March 15, 2021, Counsel received a letter from Reliance dated February 19, 2021, but not mailed until February 23, 2021, which stated that a copy of a report constituting an "independent review" of Ms. Stickley's medical file (the "Reliance Report") was enclosed and demanded that she file a response by March 5, 2021.   However, no such report was enclosed with the letter.

124.   On March 16, 2021, by first-class mail, facsimile and e-mail, Counsel informed Reliance that he had received Reliance's February 23 letter the day before (March 15), but that no report was enclosed with the letter.

125.   On March 16, 2021, Counsel finally received the Reliance Report by fax. The Reliance Report was prepared by a Texas psychologist, Dr. Critchfield, of MES Peer Review Services, who was hired by Reliance to review Ms. Stickley's file.

126.   The Reliance Report contained a series of "special instructions" from Reliance to Dr. Critchfield that constitute internal guidelines and criterion upon which Reliance would rely to evaluate Ms. Stickley's claim.  For example, Reliance requested that Dr. Critchfield review the record for: conclusive evidence of the presence or absence of complaints; Ms. Stickley's diagnosis and whether it correlated with clinical findings; whether or not cognitive impairment was identified and the nature of such impairment; whether the treatment plan was reasonable and appropriate; Ms. Stickley's prognosis; and her functional ability in a work environment.  Dr. Critchfield was also requested to respond to very specific questions relating to Ms. Stickley's work abilities.

127.   Reliance never supplied these guidelines or criteria to Ms. Stickley, despite her repeated requests for such information as per Reliance's own policies promising to provide them upon request.

128.   Despite the numerous and significant medical records from Ms. Stickley's treating physicians and therapists concluding that she sustained a head injury and was unable to work full time, Dr. Critchfield concluded that there was no support whatsoever for a finding that cognitive deficits would have resulted in functional impairment, and no support

30

whatsoever for a finding that Ms. Stickley was unable to perform full-time work during any period of time following her December 14, 2019 injury, including the days and weeks directly after the fall.

129.    Dr. Critchfield never provided analysis regarding the specific cognitive and visual requirements of Ms. Stickley's work as an attorney; how persistent symptoms limited her ability to work; or how Ms. Stickley was expected to work for 30 hours or more per week (six hours or more per day) as per Reliance Policy, as an attorney handling complex matters, when all of her providers had advised her to cease work completely to avoid exacerbating her injury.

130.    Dr. Critchfield never met with Ms. Stickley, spoke to her, or interviewed her family members or her law partners.

131.    Dr. Critchfield's conclusions in the Report demonstrate tactics much like Reliance's review in the May 12, 2020 CDM Discussion, in that Dr. Critchfield minimized the extent of Ms. Stickley's injury and symptoms and either overlooked, or flagrantly mischaracterized facts.

132.    For example, he presumed that because she was doing at least some attorney work at the time of his review, she must not be limited in her problem-solving ability.  He made no inquiry as to the types of work attempted or performed or whether the work was successful.  He failed to account for the fact that trial work requires an attorney to maintain focus under high stress for periods as long as 10-12 hours, often with no appreciable breaks, and sometimes over the course of several days in a row.

133.    He concluded that because she was now doing some driving, she must not have impairments with visual sequencing or scanning.  He made this presumption without any inquiry into the amount of driving, no formal follow-up testing, and despite her significantly impaired scores in this area several months earlier.  Dr. Critchfield deferred to Dr. Levy's expertise as to visual impairments, but failed to address Dr. Levy's findings.

134.    He also discounted a key component to Ms. Stickley's symptoms, which is that her ability to function worsened after several hours of attempted work activity.  Dr. Critchfield noted that on September 14, 2020, Ms. Stickley underwent neuropsychological testing for four hours.  Based upon this observation, he concluded that she had high levels of cognitive endurance (presumably dating all the way back to her injury on December 14, 2019), and that she was at no time disabled from full-time attorney work—meaning, under Reliance policy, that she could work for six hours per day.  He did not acknowledge that she required a break during the September 14, 2020 testing due to fatigue, or note that other, similar activities lasting more than a couple hours often resulted in complete debilitation and lengthy recovery time. Furthermore, Dr. Critchfield did not acknowledge Dr. Bender's findings from the September 14 testing as set out above in Paragraph 100.

135.    Additionally, Dr. Critchfield concluded that Ms. Stickley's records did not provide support for a DSM-5 cognitive disorder. This was the first that the DSM-5 cognitive disorder classification method had been mentioned in the record. Reliance had never disclosed any requirement that Ms. Stickley's disabilities be classified as a DSM-5 cognitive disorder for eligibility purposes, despite at least four written requests by Counsel for such requirements.

32

136.   On March 31, 2021, Counsel responded to the Reliance Report, pointing out Dr. Critchfield's many erroneous conclusions and oversights of medical documentation and specifically noting that the Reliance Report addressed only cognitive defects and psychological symptoms but failed to address the physical symptoms Ms. Stickley was experiencing after the onset of work fatigue.

137.   Counsel's March 31, 2021 letter also included additional updated medical records.   These records from Ms. Stickley's treating neurologist, Dr. Khera, showed that, based upon her continued symptoms of headaches, light/sound sensitivity, memory loss and word finding difficulties, (all of which are consistent with his diagnosis of post-concussive syndrome and head injury), she was unable to work for 30 hours or more per week as an attorney.  Dr. Khera noted that high concentration and stress associated with her work tasks would exacerbate her symptoms.

138.   Updated records from Ms. Stickley's treating neuro-ophthalmologist, Dr. Levy, reported that Ms. Stickley continued to suffer from visual impairments and headaches after about two hours of reading or computer work, and that driving for even short distances exacerbated her symptoms.

139.   Newly submitted records from Ms. Stickley's psychologist, Dr. Ellison M. Cale, ruled out the presence of any non-head-injury-related psychological factors that could be causing Ms. Stickley's symptoms.  Dr. Cale's notes also reiterated the importance of Ms. Stickley's physical symptoms (pressure, headaches, ear ringing, etc.), which worsened with increased cognitive demands.  Like Dr. Bender, Dr. Cale concluded that Ms. Stickley desperately wanted to return to normal work.

140.    On April 27, 2021, Reliance informed Counsel that it was upholding its initial denial on Ms. Stickley's appeal (the "Final Denial Letter").  The letter mistakenly stated that on appeal, it was affirming its original decision to terminate Ms. Stickley's benefits, which was in error given that Ms. Stickley had never received benefits in the first place.

141.    In the Final Denial Letter, the specific reasons provided for the final adverse decision were based entirely on Dr. Critchfield's report, setting forth his responses to each specific criterion that Reliance had requested that he focus upon, but which it had failed to ever provide to Ms. Stickley.

142.    Reliance's Final Denial Letter specifically cited Dr. Critchfield's finding that, although the medical records supported a diagnosis of mild traumatic brain injury or concussion, they did not provide support for a DSM-5 cognitive disorder.

143.    Reliance's Final Denial Letter specifically cited Dr. Critchfield's conjecture that at no time after her fall on December 14, 2019 was there support that any functional impairment would have prevented Ms. Stickley from working full time, ignoring all medical records to the contrary.

144.    The Final Denial Letter based its decision solely on the broad definitions of "Total Disability," "Partial Disability," and "Residual Disability" in the Policy.  It provided no further mention of any internal rules, guidelines, protocols or other similar criterion relied upon in making the adverse determination, nor did it reference any such rule, guideline or criterion necessitating support for a DSM-5 cognitive disorder.

145.    According to the analysis provided by Reliance and Dr. Critchfield, Ms. Stickley should have disobeyed all of her treating physicians and rehab therapists, and continued working full-time, despite her limitations and their warnings.

146.    The Final Denial Letter stated that the hard copy of Ms. Stickley's appeal was received on January 19, 2021, without explaining why it failed to recognize its confirmed receipt of the appeal on November 6, 2020, or Reliance's electronic receipt of the appeal again on January 13, 2021.

147.    Even assuming *in arguendo* that Reliance first received Ms. Stickley's appeal on January 19, 2021, Reliance's response to the appeal still exceeded the 90-day deadline set forth in the Policy.

148.    Reliance's Final Denial letter advised that Ms. Stickley had exhausted her administrative remedies. It also promised to provide copies of all documents, records, and/or other information relevant to Ms. Stickley's claim for benefits upon request. Additionally, it promised upon request to provide copies of any internal rule, guideline, protocol or other similar criterion (if any) relied upon in making its final determination.

149.    On July 20, 2021, once again, Counsel submitted a written request, via certified mail and facsimile, for: (1) copies of all documents, records, and/or other information relevant to Ms. Stickley's claim for benefits; and (2) any internal rules, guidelines, protocols or other similar criterion relied upon by Reliance in making its determination.  Reliance received Counsel's request on July 23, 2021.

150.    As of the date of this Complaint, Reliance has failed to respond or otherwise provide the requested documentation. Months have transpired since Counsel's first and

many requests for the documents necessary to fully prepare for and assert Ms. Stickley's claim for benefits under the Reliance Policy.

151.    Under the terms of the Policy Ms. Stickley is entitled to "Covered Monthly Earnings" of $5,961.97 per month, which amount is offset by her actual monthly earnings.

152.    As of December 31, 2021, Ms. Stickley is entitled to $98,504.52 in benefits under the policy.

153.    Ms. Stickley continues to improve but is still unable to work on a full-time (more than 30 hours per week) basis at the time of the filing of this Complaint and her earnings are not sufficient to offset the benefits to which she is entitled under the Policy.

154.    Based upon her age at the time of disablement, the Policy provides that she is entitled to three and one-half (3 ½) years of benefits.

### COUNT I
### WRONGFUL DENIAL OF BENEFITS
### UNDER ERISA, 29 U.S.C. § 1132

155.    Plaintiff Stickley incorporates by reference the allegations set forth in paragraphs 1 through 154 of this Complaint for Damages as if fully set forth herein.

156.    The Defendant has wrongfully denied disability benefits owed to Plaintiff Stickley, who became Totally Disabled on December 14, 2019 in that she could not perform the material duties of her own occupation for 30 hours or more per week.

157.    The Defendant's denial is contrary to the purpose and goal of its Policy.

158.    The Defendant's decision to deny benefits is not supported by substantial evidence.

159.     The Defendant's interpretations of its own Policy are inconsistent with respect to how it applied the Policy to Plaintiff Stickley's claim throughout its determination of her eligibility.

160.     The Defendant's decision to deny benefits is not the result of a deliberate, principled reasoning process.

161.     The Defendant failed to accord proper weight to the evidence in the administrative record showing that Plaintiff Stickley was continuously and Totally Disabled under the Policy since December 14, 2019.

162.     The Defendant is acting under a conflict of interest in making a determination of benefits in this matter, requiring the Defendant to provide an increased amount of substantial evidence to support its denial of benefits, and to suffer a greater burden to prove its decision was objectively reasonable.

163.     The Defendant has violated its contractual obligation to provide Long Term Disability benefits to Plaintiff Stickley.

<u>**COUNT II**</u>
<u>**BREACH OF FIDUCIARY DUTY UNDER ERISA**</u>

164.     Plaintiff Stickley incorporates by reference the allegations set forth in paragraphs 1 through 163 of this Complaint for Damages as if fully set forth herein.

165.     The Defendant has breached the fiduciary duty it owes to Plaintiff Stickley by failing to afford her the basic due process guarantees by 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1133 and the regulations promulgated thereunder.

166.     The Defendant wrongfully denied Plaintiff Stickley a full, fair and impartial review of her benefits claim by ignoring the overwhelming weight and credibility of

37

evidence submitted and instead behaved as an adversary, choosing instead less credible evidence of marginal significance to support its goal of denying her benefits claim.

167.   The Defendant did not give proper weight to Plaintiff Stickley's complaints regarding the debilitating effects of her symptoms, as well as the strain, significant effort, and considerable time her treatment for brain injury required to make even incremental improvements.

168.   The Defendant has ignored the records and opinions of Plaintiff Stickley's treating and examining physicians that show that Plaintiff Stickley is totally disabled, and instead based its decision to deny benefits in part upon an internal review by Reliance staff members who had never seen or treated Plaintiff, who disregarded her medical records and observations of Reliance's own Claims Examiners prior to their review,  and who were not qualified as Plaintiff Stickley's treating and examining physicians to formulate opinions regarding the cause, nature and extent of her disability.

169.   The Defendant ignored months of vocational evidence (including a functional capacity evaluation) from Plaintiff Stickley's certified vocational rehabilitation specialists, all of which show that Plaintiff Stickley is totally disabled.

170.   Instead, the Defendant based its decision to deny benefits on its own internal review, and the conclusions of a non-treating, independent, Reliance-hired psychologist who was not as qualified as Plaintiff Stickley's vocational rehabilitation specialist team to formulate opinions regarding the nature and extent of her disability.

171.   By engaging in the acts and omissions described above, including but not limited to interpreting the Policy in a manner contrary to applicable federal law, and refusing

to provide Plaintiff Stickley a benefit mandated by ERISA, the Defendant has breached its fiduciary duty to Plaintiff Stickley and has violated ERISA.

## COUNT III
## FAILURE TO COMPLY WITH REQUESTS FOR INFORMATION

172.    Plaintiff Stickley incorporates by reference the allegations set forth in paragraphs 1 through 171 of this Complaint for Damages as if fully set forth herein.

173.    The Defendant has breached the duty it owes to Plaintiff Stickley by failing to provide her the information she requested on June 19, 2020, August 4, 2020, November 5, 2020, January 13, 2021, January 22, 2021, and July 20, 2021 as required by 29 U.S.C. § 1132 (c).

174.    Plaintiff Stickley is thus entitled to seek recovery for Defendant's breach pursuant to 29 U.S.C. § 1132(a)(1)(A).

**WHEREFORE**, Plaintiff Stickley requests that this Court enter judgment in her favor and against Defendant Reliance, on all claims brought and provide her with the following relief:

a)    Enter a declaratory judgment declaring that the Defendant wrongfully deprived Plaintiff Stickley of her rights, privileges, compensation, and other benefits and entitlements under the law;

b)    Enter an Order that the Defendant pay Plaintiff Stickley Long Term Disability benefits, calculated from March 13, 2020, the end of her Elimination Period, through December 31, 2021 in the amount of $98,504.52, plus any additional benefits that accrue thereafter, until September 13, 2023.

39

c)      Enter an Order that the Defendant pay prejudgment interest on the amount of Long Term Disability benefits it pays to Plaintiff Stickley;

d)      Enter an Order that the Defendant pay Plaintiff Stickley the maximum penalty allowed under 29 U.S.C. § 1132(c), for failure to provide her requested information to which she was entitled under ERISA for each day of violation, for each request;

e)      Enter an Order that the Defendant reimburse Plaintiff Stickley for benefit premiums she paid during the time period in which she would have been receiving benefits under the Policy, pursuant to the Policy;

f)      Enter an Order awarding Plaintiff Stickley all reasonable attorney fees and expenses incurred as a result of Defendant's wrongful denial in providing coverage;

g)      Enter an award for such other relief as may be just and appropriate.

DILLINA W. STICKLEY
By Counsel

/s/ Jacob T. Penrod
Jacob T. Penrod (VSB 65819)
Nicole D. Faut (VSB 95373)
HOOVER PENROD PLC
342 South Main Street
Harrisonburg, VA 22801
Telephone:  (540) 437-2235
Facsimile:  (540) 433-3916
Electronic Mail:  jpenrod@hooverpenrod.com
Electronic Mail:  nfaut@hooverpenrod.com
*Counsel for Plaintiff*

40